# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | **Criminal No. 04cr355-05 (CKK)** |
| BRYAN BURWELL, | **(Civil Action No. 14-270)** |
| Defendant. | |

## MEMORANDUM OPINION
(February 16, 2016)

Presently before the Court is the sole remaining claim in Bryan Burwell's [822] Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence, his ineffective assistance of counsel claim related to his trial counsel's alleged failure to interview witness Reon Holloway regarding his knowledge of Burwell's whereabouts on May 27, 2004, and to question him about this when Holloway testified at trial. *See* Memo. Op. (Jan. 15, 2015), at 43-46, ECF No. [854]; Memo. Op. (Mar. 12, 2015), at 4-8, ECF No. [873]. The Court denied all of Burwell's other claims in his § 2255 motion pursuant to its Orders and accompanying Memorandum Opinions issued on January 15, 2015, and March 12, 2015, which the Court INCORPORATES herein.[1] The Court

---

[1] Pursuant to its January 15, 2015, [853] Order, and accompanying [854] Memorandum Opinion, the Court denied Burwell's claims that his attorneys were ineffective for: (1) failing to challenge the violation of his statutory right to a speedy trial prior to trial; (2) failing to raise double jeopardy and multiplicity challenges to the indictment prior to trial and failing to move to dismiss based on this challenge during trial; (3) failing to raise a Confrontation Clause challenge to certain evidence during trial and on appeal; (4) generally providing a "poor overall performance" at trial; (5) failing to allow Burwell to exercise his right to testify at trial; (6) failing to challenge government misconduct at trial and on appeal; (7) failing to give an effective closing argument at trial; (8) failing to request an informant jury instruction at trial; (9) failing to request a theory-of-defense instruction at trial; (10) failing to request polling of the jury at trial; and (11) failing to properly challenge juror misconduct and bias at trial and on appeal. Memo. Op. (Jan. 15, 2015), at 6-49. Further, the Court denied Burwell's request to vacate, set aside, or correct his sentence on the basis that the jury instructions related to Count XI were erroneous in light of recent Supreme

ordered additional briefing and held an evidentiary hearing on December 1, and 3, 2015, regarding the remaining claim in Burwell's § 2255 motion.  Upon consideration of the pleadings,[2] the testimony provided during the evidentiary hearing, the relevant legal authorities, and the record as a whole, the Court finds no grounds for setting aside Burwell's conviction and sentence. Accordingly, Burwell's [822] Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence is DENIED in its entirety for the reasons described herein.

## I. BACKGROUND

The Court fully set out the procedural history of this matter in its Memorandum Opinion of January 15, 2015.  Memo. Op. (Jan. 15, 2015), at 1-4.  As such, the Court shall focus on the facts relevant to Burwell's narrow remaining ineffective assistance of counsel claim.  In the instant § 2255 motion, Burwell characterizes his ineffective assistance of counsel claim, raised against

---

Court precedent. *See id.* at 46-47.   Pursuant to its [872] Order of March 12, 2015, and accompanying [873] Memorandum Opinion, the Court denied Burwell's ineffective assistance of counsel claim related to his counsel's alleged failure to properly prepare witness Brenda Ramirez to testify.  Memo. Op. (Mar. 12, 2015), at 8-11.

[2] While the Court renders its decision today on the record as a whole, its consideration has focused on the following documents: Def.'s Mot. to Vacate Sentence ("Def.'s Mot."), ECF No. [822]; Def.'s Memo. in Support of Mot. ("Def.'s Memo."), ECF No. [822-1]; Govt.'s Opp'n to Def.'s Mot. to Vacate Sentence ("Govt.'s Opp'n"), ECF No. [827]; Def.'s Reply Brief ("Def.'s Reply"), ECF No [851]; Affidavit of Bryan Burwell ("Burwell Affidavit"), ECF No. [870]; Govt.'s Response to Court's March 12, 2015 Order ("Govt.'s Resp. to Court's Order"), ECF No. [886]; Govt.'s Resp. to Court's Order, Ex. 1, ("Martin Affidavit"), ECF No. [886-1]; Govt.'s Resp. to Court's Order, Ex. 3, at 1-2 ("Martin Letter") (Jun. 7, 2005), ECF No. [886-3]; Govt.'s Resp. to Court's Order, Ex. 3, at 3-5 ("Burwell Letter #1"), ECF No. [886-3]; Govt.'s Resp. to Court's Order, Ex. 4 ("Burwell Letter #2"), ECF No. [886-4]; Govt.'s Resp. to Court's Addendum to March 12, 2015, Order ("Govt.'s Resp. to Court's Addendum"), ECF No. [900]; Def.'s Traverse to The Govt.'s Addendum Addressing Its Position on The Conspiracy Statute concerning Rico ("Def.'s Traverse"), ECF No. [918]; Def.'s Mot. to Supp. Sec. 2255, ECF No. [947]; transcripts of hearings and trial; and exhibits introduced into evidence at the evidentiary hearing held on December 1, and 3, 2015.

Anthony D. Martin, his trial counsel, as follows:

> Counsel was supposed to have sent out investigator to alibi witness's house on "one" occasion despite Petitioner's plea that this witness was key to connection of DNA on one of the flash jackets found at one of the alleged stash houses. Counsel actually apologized for his negligence in the matter saying he "thought" the investigator was on top of the situation and that he interviewed each alibi witness properly. Counsel also stated that he has "messed up" and the issue would become an appeal issue due to the outcome of the case . . . .

Def.'s Memo. at 18. The Court issued an Order holding in abeyance this claim and directing Burwell to file a sworn statement identifying the witness who was "key to connection of DNA on one of the flash jackets" and provide a proffer of what testimony that witness would have provided at trial. Order (Jan. 15, 2015). Burwell filed an Affidavit in response, indicating that this witness referenced in his § 2255 motion is Reon Holloway.

Holloway testified at trial that Burwell gave him a camouflage vest identified as Exhibit "Brinkley 26" ("flak jacket") in fall 2002 or spring 2003 and that Holloway sold the vest to government witness Noureddine Chtaini around Christmas of 2003. Tr. 7462:21—7468:6 (Jun. 16, 2005). However, Burwell in his Affidavit filed in response to the Court's Order identified Holloway not just as a witness who could testify regarding the camouflage vest, but also as a witness who could provide him with an alibi for the date of one of the bank robberies. Holloway did not provide any alibi testimony at trial. Specifically, Burwell indicates in his Affidavit:

> Had my lawyer asked Holloway about my where-abouts on the date of May 27, 2004, Holloway would have informed the jury that he and I were together at Longfellow Street, on the morning in question as well as the remaining portion of that day.
>
> . . .
>
> I very specifically requested my lawyer to pursue Mr Holloway concerning my where-abouts, and he had informed me that he had complied. I was not aware that

counsel had not properly asked Holloway about where I was on the day in question until this witness was dismissed from the stand. Following dismissing Holloway I asked my lawyer about why he had not asked Holloway about my alibi he informed me that he had not obtained that information and did not want to bring it up because he was unaware of what Holloway might say. This witness was a crucial part of my defense because he would have provided the jury with an alternative location of my where-abouts thereby raising reasonable doubt resulting in an acquittal.

. . .

At an evidentiary hearing I am positive that my trial counsel would admit to this over-sight that ultimately led to my conviction.

Affidavit ¶¶ 2, 5. Burwell's whereabouts on this date is relevant because he was charged in the indictment with Racketeering Act 6 under Count I (RICO conspiracy charge), the May 27, 2004, robbery of the Chevy Chase Bank in Chillum, Maryland. Burwell was not separately charged with any counts related solely to the May 27, 2004, bank robbery.[3] *See* Superseding Indictment (Feb. 15, 2005), ECF No. [175].

The Government provided an Affidavit from Burwell's trial counsel, Anthony D. Martin, addressing the arguments raised by Burwell with respect to this issue. In his Affidavit, Martin explains:

During our numerous discussions, the only alibi witness that Mr. Burwell ever mentioned was Brenda Ramirez. Mr. Reon Holloway was called to offer an explanation as to the presence of Mr. Burwell's DNA on the bulletproof vest that was linked to the bank robberies. Mr. Burwell knew the scope of my intended examination of Mr. Holloway given my June 7th, 2005 letter. Indeed, a letter from

---

[3] The Court ordered additional briefing on the legal issue of whether Burwell's participation in this bank robbery, one of two predicate acts for the RICO conspiracy charge, was required to be proven by the jury in order to support a conviction. *See* Addendum to Ct.'s Mar. 12, 2015, Order, ECF No. [874]. However, after reviewing the parties' briefing on this issue, the Court set this matter for an evidentiary hearing in light of the jury instructions given at trial related to RICO conspiracy charge and the factual dispute discussed further below in the affidavits submitted by Burwell and Martin. *See* Order (Sept. 29, 2015) at 6-9, ECF No. [939]. For the reasons described below, the Court does not reach this issue because it bases its ruling on other grounds.

> Mr. Burwell to Mr. Holloway regarding his testimony mentions nothing about Holloway offering an alibi.
>
> Furthermore, there was no communication from Mr. Burwell to either me or my investigator suggesting that Mr. Holloway was an alibi witness. Notwithstanding my reluctance to have Mr. Holloway testify and advisement that he not be called, Mr. Burwell insisted. Moreover, my efforts to personally find and meet with Mr. Holloway and contact his attorney are well documented in the record of trial. Finally, at no time did I ever tell Mr. Burwell, that I had "messed up."

Martin Affidavit at 2 (citations and emphasis omitted). Given the factual dispute between Burwell and Martin, the Court appointed counsel to represent Burwell in relation to this remaining ineffective assistance of counsel claim in his § 2255 motion, and set this matter for an evidentiary hearing in order to have the most complete record on which to rule. The Court held the evidentiary hearing on December 1, and 3, 2015, during which Holloway, Burwell, and Martin testified.

Given the scope of its inquiry, the Court shall briefly address the record at trial surrounding Holloway's testimony. On June 13, 2005, Burwell's trial counsel indicated on the record that Holloway ignored two subpoenas requiring him to appear to testify at trial. Burwell's trial counsel explained that Burwell requested that Holloway be brought to Court to testify by the United States Marshals, which Burwell himself confirmed on the record. Burwell's counsel also asserted that it was his determination that this course of action was not in Burwell's best interest. Ultimately, Burwell's counsel put on the record that he would make the request that the Marshals bring Holloway to testify at his client's request but against his advice. Tr. 6800:1—6801:2 (Jun. 13, 2005). The Court indicated that it would not direct the Marshals to pick up Holloway and transport him to Court to testify unless it was verified that Holloway was previously properly subpoenaed to appear at trial and ignored the subpoena. *Id.* at 6801:3-7; Tr. 6931:9-14 (Jun. 14, 2005). On

June 14, 2005, the Court questioned whether Holloway was properly served with the subpoena after hearing from the investigator, David Jones, who attempted to serve him but instead left the subpoena at Holloway's door after he was unable to locate Holloway and the woman who answered the door refused to accept the subpoena.  *Id.* at 6944:3—6946:15.   Nonetheless, it appears that the request to send the Marshals to pick up Holloway became moot as Burwell's counsel informed the Court that he had discovered that Holloway was detained at the Correctional Treatment Facility ("CTF").   In light of this information, the Court issued a come-up to require Holloway's transport from CTF to Court.   *Id.* at 7040:10-15, 7042:9-10; Tr. 7209:11 (Jun. 15, 2005).

At the relevant time period, it appears that Holloway had charges pending against him in the Superior Court of the District of Columbia ("Superior Court") and was represented by attorney Richard Samad.  *See* Tr. 6932:3-5, 6932:12-13, 6947:22-24 (Jun. 14, 2005).   On June 14, 2005, Martin also informed the Court of the following with relation to Holloway:

> This witness is being called against my advice. Mr. Burwell wants this witness called.  And I have spoken to Mr. Holloway's attorney twice.  My understanding is Mr. Samad has advised Mr. Holloway not to testify.  And I have also sent my investigator out no less than twice.  And Mr. Holloway, as far as I can tell, is evading him.
>
> . . .
>
> I know he has a pending case in Superior Court. I've never spoken to Mr. Holloway, so that's another reason I don't want to call him.  I have no clue what he's going to say when he takes the stand.

*Id.* at 6932:2-15.  While Martin indicated that he had not spoken with Holloway, Jones, the defense investigator, indicated on the record that he had interviewed Holloway in April or early May.  *Id.*

at 6945:14-15.

With regard to Holloway's representation by Samad, the Court indicated on the record that it would need to know the basis for Samad's objection to Holloway testifying in the instant action. The Court indicated that if Samad was asserting a Fifth Amendment claim on behalf of Holloway, then the Court would require Holloway to be represented by counsel in relation to this issue. *Id.* at 7040:20—7041:13, 7041:18-24, 7042:9-25.   The Court further noted that it would conduct an inquiry on the record with regard to the Fifth Amendment issue if it was raised. *Id*. at 7042:9-25. On the morning of June 15, 2005, Holloway was transported to Court and the Court located Samad who was appearing across the street at Superior Court.   Tr. 7209:11—7210:2 (Jun. 15, 2005). When Samad arrived in Court, the Court took a recess to allow Samad and Martin to speak to each other and with Holloway, who was in the cellblock. *Id.* at 7270:6—7272:19.   After the recess, Martin indicated that there was no Fifth Amendment issue with regard to the testimony of Holloway. *Id.* at 7273:10-14.   After the Court took a break for lunch on June 15, 2005, the Court indicated that it would prefer to put Holloway on the stand that day so that he did not need to be transported back to Court on the following day since he was in a wheelchair. *Id.* at 7312:23—7313:1.   However, later in the day, the Court indicated that it was unlikely that they would reach Holloway's testimony that day, and that the Court would issue a come-up for the following day to facilitate Holloway's transport to Court from CTF. *Id.* at 7366:6-15.   Holloway was the first witness to testify on the morning of June 16, 2005. *See* Tr. 7461:12-17, 7462:21-25 (Jun. 16, 2005).   Holloway's testimony only addressed the flak jacket and there was no discussion of Burwell's whereabouts on May 27, 2004.   Tr. 7462:21—7468:6 (Jun. 16, 2005).

## II.  LEGAL STANDARD

Under 28 U.S.C. § 2255, a prisoner in custody under sentence of a federal court may move the sentencing court to vacate, set aside, or correct its sentence if the prisoner believes that the sentence was imposed "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a). The circumstances under which such a motion will be granted, however, are limited in light of the premium placed on the finality of judgments and the opportunities prisoners have to raise most of their objections during trial or on direct appeal.  "[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal."  *United States v. Frady*, 456 U.S. 152, 166 (1982).  Nonetheless, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  28 U.S.C. § 2255(b).

A prisoner may not raise a claim as part of a collateral attack if that claim could have been raised on direct appeal, unless he can demonstrate either: (1) "cause" for his failure to do so and "prejudice" as a result of the alleged violation, or (2) "actual innocence" of the crime of which he was convicted.  *Bousley v. United States*, 523 U.S. 614, 622 (1998).  However, "[w]here a petitioner raises claims of ineffective assistance of counsel in a § 2255 motion, he need not show 'cause and prejudice' for not having raised such claims on direct appeal, as these claims may properly be raised for the first time in a § 2255 motion."  *United States v. Cook*, 130 F. Supp. 2d 43, 45 (D.D.C. 2000), *aff'd*, 22 F. App'x 3 (D.C. Cir. 2001) (citation omitted).

A defendant claiming ineffective assistance of counsel must show (1) "that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms," and (2) "that this error caused [him] prejudice." *United States v. Hurt*, 527 F.3d 1347, 1356 (D.C. Cir. 2008) (citation omitted). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence . . . ." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). It is the petitioner's burden to show that counsel's errors were "so serious" that counsel could not be said to be functioning as the counsel guaranteed by the Sixth Amendment. *Harrington v. Richter*, 562 U.S. 86, 104 (2011). "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions . . . . [I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of . . . counsel's other litigation decisions." *Strickland*, 466 U.S. at 691. In evaluating ineffective assistance of counsel claims, the Court must give consideration to "counsel's overall performance," *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986), and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689. Moreover, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

### III. DISCUSSION

At the evidentiary hearing, the witnesses presented conflicting testimony regarding Martin's knowledge that Holloway could present alibi testimony for the May 27, 2004, bank robbery. In light of the factual dispute between Burwell and Martin, the key issue before the Court

9

is whether Martin knew that Holloway could present alibi testimony on Burwell's behalf for the May 27, 2004, date.  In reaching its decision on this issue, the Court shall discuss the pertinent evidence before it.  The Court shall first review the conflicting accounts provided by the witnesses at the evidentiary hearing.  The Court shall then discuss the documents created by Burwell and Martin prior to and during trial.  The Court shall next turn to Burwell's account of Martin's explanation for not eliciting Holloway's alibi testimony.  The Court shall then address Martin's and Jones' dealings with Holloway prior to him testifying at trial.  The Court shall also discuss the post-conviction pleadings filed on Burwell's behalf and by Burwell. Finally, the Court shall address a separate issue raised by Burwell in a supplemental brief submitted *pro se* on February 12, 2016, regarding the Supreme Court of the United States' recent decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015).

For the reasons described herein, the Court finds that Martin was unaware that Holloway could present alibi testimony for Burwell on May 27, 2004, up until the instant proceedings on Burwell's § 2255 motion.  As such, Burwell's ineffective assistance of counsel claim fails because Martin's performance is not deficient for failing to investigate information that was never provided to him.

### A.  Two accounts provided by the witnesses at the evidentiary hearing

At the evidentiary hearing, two conflicting accounts of the information provided to Martin leading up to trial regarding Holloway's potential alibi testimony were advanced – one account based on the testimony of Burwell and Holloway and one account based on Martin's testimony. The Court shall address each account in turn.

10

### 1. *Burwell's and Holloway's account*

Burwell and Holloway provided largely consistent testimony regarding the incidents that occurred on May 27, 2004. According to both of them, Burwell came over to Holloway's house sometime between 9:30 a.m. and 10:00 a.m. on May 27, 2004, and the two were together outside in the neighborhood continuously until late in the evening or very early the next morning. Holloway indicated that he came over to Burwell's house before 10:00 a.m., which is the time that the liquor store in the neighborhood opens. Tr. 29:3-14 (Dec. 1, 2015).

Burwell testified that he told both Jones and Martin that Holloway should be called as an alibi witness on his behalf for the May 27, 2004, bank robbery. *Id.* at 40:19-22. While Burwell could not remember the specific date or time frame, he indicated that he identified Holloway as an alibi witness while he was working with Martin to build his defense theory. *Id.* at 48:10-14. During the same meeting, Burwell testified that he believes he told Martin both about Holloway's ability to testify regarding the flak jacket and Burwell's whereabouts on the date of the first bank robbery, as well as about another alibi witness, Brenda Ramirez, who could testify as to his whereabouts on the date of the second bank robbery. *Id.* at 53:17—56:12.

Holloway similarly testified that he told both Jones and Martin about his ability to serve as an alibi witness for Burwell. *Id.* at 9:6-11, 11:9—12:1. Specifically, Jones met with Holloway on two occasions, once briefly at his home and once at the Correctional Treatment Facility[4] ("CTF") for 30 to 45 minutes. *Id.* at 7:13-16, 8:5-16, 15:8-13, 19:11-14. During both meetings, Holloway told Jones about his ability to testify regarding Burwell's whereabouts on May 27, 2004, and the

---

[4] Holloway was being detained at that time while awaiting sentencing in a case that was pending in the Superior Court of the District of Columbia. Tr. 19:11-20 (Dec. 1, 2015).

two also discussed the flak jacket.  *Id.* at 15:22—16:24, 20:9-11.

Holloway also indicated that he met with Martin for about ten minutes in the bullpen in this courthouse on the day that he testified.  *Id.* at 9:18-25, 10:10-14.  At that meeting, Holloway and Martin discussed the same things that Holloway told Jones, including the flak jacket and Holloway's information about Burwell's whereabouts on May 27, 2004.  *Id.* at 10:18-25.  Martin specifically asked Holloway whether he could testify that Holloway and Burwell were together on May 27, 2004.  *Id.* at 11:9-12.  Holloway told Martin that he could testify to that and had he been asked on the stand, he would have testified that he and Burwell were together continuously from 9:30 or 10:00 a.m. for the remainder of the day.  *Id.* at 11:1—12:1, 12:15—13:16.  Based on Holloway's testimony, it is reasonable to conclude that by his account, Martin knew that Holloway spoke with Jones about his potential alibi testimony.  *See id.* at 10:21-23 ("He said, you know, you spoke with my investigator and we're going to go over that same things that you guys spoke about pertaining to the vest and his whereabouts.").

During the evidentiary hearing, both Burwell and Holloway provided specific details about events occurring on May 27, 2004, that both indicated they did not provide to either Jones or Martin.  *Id.* at 16:20—19:8, 79:2—81:8.  Specifically, 10 to 20 other people were outside in the neighborhood with Burwell and Holloway at various times during the day and, on that day, Burwell and Holloway got Burwell's father, Buster Burwell, drunk because it was almost his birthday.  *Id.* at 17:2—18:16, 80:1—81:12.  Burwell indicated that he could not list the names of the other people who were outside with them that day.  *Id.* at 80:7—81:8.  Moreover, he indicated that he did not tell Martin about his father being present because Martin previously told him with respect to potential testimony from his wife, that family members were not credible witnesses.  *Id.* at 79:16-

25.

### 2. Martin's account

Martin provided a conflicting account of what he was told by Burwell regarding Holloway's possible alibi testimony. Martin repeatedly contended during the evidentiary hearing that at no time did Burwell indicate to him that he had an alibi witness for May 27, 2004, or identify Holloway as potentially being able to provide alibi testimony for that date. *Id.* at 104:20—105:10, 119:17-20, 167:6-8. Rather, Martin indicated that the purpose of calling Holloway to testify was so that he could provide an explanation for the presence of Burwell's DNA on a flak jacket in evidence. *Id.* at 107:21-24, 111:15-18, 118:2-4. Further, Martin indicated that the first time he heard about Holloway's ability to serve as an alibi witness for the date in question was when Burwell made that assertion in an affidavit filed in February 2015, related to the instant § 2255 motion. *Id.* at 167:6-8. Moreover, Martin testified that Jones never told him Holloway could serve as an alibi witness, *id.* at 119:13-16, and instead that Jones told him that Holloway had denied knowing anything about the flak jacket during their meeting, *id.* at 117:4-6.

Martin also indicated that he did not remember whether he had a conversation with Holloway prior to him testifying, *id.* at 155:14-15, but that he thought that he was "pretty sure" that he would have spoken to him briefly before calling him to the stand, *id.* at 155:20-21, 156:8-10. However, Martin indicated that if he did talk to Holloway, they would have discussed the flak jacket because that was the reason that Holloway was being called as a witness. *Id.* at 156:3-4. Given that the Court was presented with conflicting testimony regarding the key issue of whether Martin was aware of Holloway's potential alibi testimony, the Court next turns to the documents admitted into evidence during the evidentiary hearing.

**B.  Documents created by Burwell and Martin prior to and during trial**

During the evidentiary hearing, several documents were admitted into evidence that were created by Burwell and Martin prior to and during trial.  These documents are significant because they support Martin's testimony that Holloway would testify about the flak jacket but do not mention Holloway's potential alibi testimony.  Moreover, the documents also reflect that Ramirez was identified as a potential alibi witness for a different date and Martin pursued that information.  The Court shall first discuss the former set of documents and then shall discuss the latter set of documents.

1. *Documents reflect Holloway's potential testimony regarding the flak jacket but not Burwell's whereabouts on May 27, 2004*

Generally, Martin kept copious notes of his conversations with Burwell and others during the investigation in this matter and Burwell himself admitted that Martin often took notes during their conversations.  *See id.* at 53:24-25 ("I know Mr. Martin, he takes notes down and he likes to ask questions and ask in depth about what's going on.").  Martin made his records fully available to Burwell's counsel in the instant action.  *Id.* at 125:9-16, 161:24—162:2, 164:22-25.  However, none of the notes or documents in Martin's file reflect that Martin was told about Holloway's potential alibi testimony, but do reflect the information about the flak jacket.

The documents introduced into evidence were created both prior to and during trial.  The exhibits establish, in part, the topics discussed by Martin and Burwell in preparation for his defense and provide a rough timeline for when such discussions may have taken place.  The Court notes that Martin filed his Notice of Appearance on Burwell's behalf on August 5, 2004, Not. of Appearance, ECF No. [18], and jury selection commenced on April 5, 2005.  At the evidentiary

hearing, the Government introduced into evidence a document titled "BURWELL NOTES," which

was created by Martin on either December 20, 2004, or January 8, 2005.  The document is typed

and also includes handwritten notes, but contains no reference to Holloway as an alibi witness.

Govt.'s Ex. K.  Martin indicated he was unsure if the general topic of alibi witnesses had been

discussed between him and Burwell at that time.  Tr. 137:5-8 (Dec. 1, 2015).  However, the

document does include a notation dated Sunday, April 3, 2005, that indicates:

> FLAK JACKET
> Was purchased during the sniper rampage (Lee Boyd Malvo and John Muhammad)
> by BRYAN BURWELL…he eventually gave this jacket to REYON
> HOLLOWAY. RH is a paraplegic who was shot during a robbery. After the
> rampage BB gave the jacket to RH. RH was introduced to CHITAINI through his
> brother DAVID MCANN.

Def.'s Ex. 3 at 7.[5]

The Government also introduced into evidence handwritten notes marked with the title

"ATTY Client Communications" that Burwell took on April 5, 2005.  Govt.'s Ex. A; *see also* Tr.

57:17—58:9 (Dec. 1, 2015).  In one portion of the notes, Burwell writes:

> Need invetorgator [sic] to go out and talk to Reyon Halloway [sic] Brother of
> Deceased Person who M.M. and N. Chatani [sic] met. Can collaborate how N.
> Chatani bought or stole not sure wich [sic] one a Camo/Flap Jacket for Him
> explaining how DNA GOT on Vest?
>
> Plus Halloway might testify against Chatani for credibility [sic] purpose say
> Chatani had various apt . . . .

Govt.'s Ex A at 2.  As such, it is clear from the note that at least as of the day that jury selection

---

[5] The Court notes that Defendant's Exhibit 3 and Government's Exhibit K are the same typed document but the Government's exhibit includes handwritten notes while Defendant's exhibit does not include handwritten notes but does include an additional page with the cited information. *See* Tr. 133:11—134:14 (Dec. 1, 2015).

began, Burwell had identified Holloway as a potential witness to provide an explanation for why his DNA was found on a flak jacket in evidence at the trial. Tr. 107:11—108:2 (Dec. 1, 2015). However, the notes do not reference Holloway's potential alibi testimony for May 27, 2004. At the evidentiary hearing, Burwell contended that while the notes do not specifically reference alibi testimony, it was implied by his reference to Holloway's ability to testify for "credibility" purposes. *Id.* at 59:7-15. Specifically, Burwell stated: "[C]redibility purpose would be alibi because [Chitaini's] testimony would have been impeached if [Holloway] said he was with me and Chitaini was with him." *Id.* at 59:9-11. As such, Burwell argues in that document he did reference Holloway's ability to rebut Chitaini's testimony that Burwell robbed the bank on May 27, 2004. However, a review of the document demonstrates that Burwell provided specific information that Holloway could provide regarding Chitaini's credibility, namely his ability to testify that: Chitaini had multiple apartments, one of which was right next to Holloway's house; Chitaini ran a "weed" factory; and Chitaini's brother had a rental silver pick-up truck around the time of the June 12, 2004, bank robbery which Burwell asserted would show the brother's association with the alleged conspiracy. Govt.'s Ex. A at 2. Indeed, nowhere in the outline of Holloway's potential testimony is there any indication that he could serve as an alibi witness nor is there any reference to the May 27, 2004, bank robbery.

The Government also introduced into evidence two document filed in the instant action by Martin on Burwell's behalf. The first is a document captioned "Defendant's Notice of an Alibi Defense" which was filed in the instant action on April 15, 2005, at the beginning of trial. Govt.'s Ex. I. In that document, Martin indicated Burwell's intent to call Ramirez as an alibi witness for the June 12, 2004, bank robbery. *Id.* However, the document makes no reference to any other

alibi witnesses. *Id.*; *see also* Tr. 109:10-13 (Dec. 1, 2015).  The second is a document captioned

"Ex Parte Motion for Subpoenas Under Seal," that was filed on June 2, 2005, while the trial was

ongoing.  Govt.'s Ex. J.  In that document, Martin on behalf of Burwell requests that the United

States Marshal serve subpoenas on five witnesses, including Holloway and Ramirez.  *Id.*  With

respect to Holloway, the document indicates: "Mr. Burwell would also like to offer an explanation

regarding the presence of his DNA on a body armor vest. This explanation can be provided by Mr.

REON HOLLOWAY."  *Id.* at 3.  By contrast, the document indicates that Ramirez would testify

as an alibi witness to one of the bank robberies.  *Id.*; Tr. 111:12-14 (Dec. 1, 2015).

At the evidentiary hearing, the Government also introduced a letter that was written by

Martin to Burwell and hand delivered to Burwell on June 7, 2005, while the trial was ongoing.

Govt.'s Ex. E.  The letter memorializes Martin's concerns that Holloway should not be called as a

witness during trial.  *Id.*  Moreover, the letter indicates that Holloway denied knowing anything

about the flak jacket to his investigator and that Holloway had been advised by his attorney not to

testify.  *Id.*  Burwell initialed the letter to indicate that he still wanted Holloway called as a witness.

Notably, the letter does not reference any potential alibi testimony from Holloway, only

information about the flak jacket. *See id.*; Tr. 72:3-5 (Dec. 1, 2015).  In sum, none of the notes or

documents in Martin's file reflect that Martin was told about Holloway's potential alibi testimony,

but do reflect the information about the flak jacket.

The documents introduced and the testimony at the evidentiary hearing demonstrate that

Martin had reasonable concerns about Holloway's credibility and it is undisputed that Martin and

Burwell did not see eye-to-eye regarding calling Holloway as a witness.  Indeed, Martin only called

Holloway because Burwell insisted.  Martin identified two letters written by Burwell that he

scanned and retained in a folder marked "2255" in his electronic files.  Tr. 115:20-25 (Dec. 1,

2015); *see also* Govt.'s Exs. C & D.  The letters were undated and Martin was uncertain as to when

they were written.  Specifically, Martin indicated that he did not remember if the letters were in

Burwell's notebook during the trial.  Tr. 116:3-16 (Dec. 1, 2005).  Martin also noted that it was

possible that the letters were written by Burwell after he was told by Martin in May 2005, that

Martin could not speak with Holloway because Holloway was represented by counsel.  *Id.* at

130:16-21.  Indeed, Martin's typed notes included an entry dated May 11, 2005, indicating that

Martin explained to Burwell that he was unable to speak with Holloway because Holloway was

represented by counsel.  Def.'s Ex. 2 at 1.  In that entry, Martin noted that Burwell said he would

contact Holloway himself.  *Id.*  Regardless of the impetus for Burwell writing these letters, the

contents of them made Martin concerned about suborning perjury if Holloway testified.  Tr.

116:21-23 (Dec. 1, 2015).  Indeed, Martin stated that he felt the letters appeared to be coaching

Holloway, and he was concerned that Holloway was either being coached or pressed to say

something untrue.[6]  *Id.* at 116:25—117:2.  The Court notes that nothing in the record reflects that

either of these letters were actually given to Holloway.  *Id.* at 12:5-11 (Holloway testifying that

Martin never showed him any letters written by Burwell and Burwell did not give Holloway any

directions regarding what he should say); *id.* at 33:11—34:8 (Burwell testifying that he never gave

the letters to Holloway and he did not think that Martin gave the letters to Holloway); *id.* at 131:1—

---

[6] Martin also indicated two other reasons for questioning the veracity of Holloway's testimony: (1) the fact that Holloway evaded Jones; and (2) the fact that Jones reported that during their meeting, Holloway said he did not remember anything about the flak jacket.  Tr. 117:4-6 (Dec. 1, 2015).  The Court shall discuss the importance of the information provided to and by Jones below.

132:4 (Martin testifying that he did not send these letters to Holloway nor did Jones and that he was not aware that Burwell or a member of Burwell's family had sent them to Holloway). However, the Court still finds that a discussion of the letters is relevant to its credibility determination as well as its ultimate determination on the issue of whether Martin was informed of Holloway's ability to serve as an alibi witness for Burwell on May 27, 2004, prior to or during trial.

In first letter, Burwell writes to someone whom he addresses as "player" and indicates that he needs a "big favor." Govt.'s Ex. C; Tr. 61:6-15 (Dec. 1, 2015). The letter then reads:

> that jacket i got flow i need you 2 say i left you with one just like it. Green camouflage with pockets and shoulder pads. i gave it to you around the time of the sniper shootings and you never wore it cause it was to big and heavy. Dolphin face/D said around December 2003 he wanted to buy it you said 300$, he bought it from you and you never saw it again. Thats all i need you to say dog and it is important you wont get in trouble for testifying for me please i need you dog. Dolphin face already mentioned 007s name on the stand so the jury already knows you jive.

Govt.'s Ex. C at 1. The second page of the document includes similar information. *Id.* at 2. Notably, the letter only references potential testimony about the flak jacket and does not discuss any possible alibi testimony for the date of May 27, 2004. During the evidentiary hearing, Burwell was not forthcoming with information about this document during his testimony. Burwell indicated that he did not know whether he wrote this note to give Martin a better understanding of Holloway's potential testimony, or whether he gave it to Martin and Martin advised Burwell that he should not give it to Holloway. *See* Tr. 63:5—66:3 (Dec. 1, 2015); *see also id.* at 33:11-21. Eventually, Burwell conceded that the letter appeared to be addressing Holloway and that he likely wanted Martin to give it to Holloway for him. *Id.* at 63:12-20. Burwell also indicated that he

could not recall who "Dolphin Face" was as referenced in the letter and that he thought they called everyone "Dolphin Face" back then.  *Id.* at 63:21—64:4.

The second letter admitted into evidence also does not reference any potential alibi testimony.  Indeed, the second letter is addressed "Whats-Up 'Focker,'" and again discusses the testimony regarding the flak jacket but does not mention any potential alibi testimony.  Govt.'s Ex. D.  The letter again references the jacket that Burwell gave to the recipient of the letter around the time of the sniper shootings.  *Id.* at 1.  The letter then goes on to indicate:

> You never wore it cause it was to tight and to heavy and big to wear in a wheel chair. So it stayed in your house till late 2003 around early December Dolphin Face AKA JESUS came over your house seen the jacket and offered you $400 for it and was persistant [sic]. You needed money at the time Christmas was coming up so you sold it to him for $425. You convinced him to go up another 25 bucks. You never saw the jacket again after you sold it to JESUS!

*Id.*  At the end of the letter, Burwell writes: "PLEASE DOG. RIDE 4 you Li _ 4 you."  *Id.* at 2. With respect to this letter, Burwell testified that he remembered that he wrote this letter to Holloway and gave it to Martin to see if it was permissible to send.  Tr. 68:21-24 (Dec. 1, 2015). However, Martin advised Burwell that it was not a good idea to send the letter to Holloway.  *Id.* at 68:5—69:5.  While Burwell was forthcoming with his purpose for writing the letter, Burwell was evasive when asked about the meaning of the reference "RIDE 4 you Li _ 4 you."  During cross-examination, Burwell was specifically asked about this portion of the letter:

> Q. It says in very big letters: Please, dog, ride for you, L-I blank for you. What does that mean?
>
> A. I don't know.
>
> Q. You wrote it?

A. It was a long time ago. I wrote a lot of stuff. I don't know what that means.

Q. Doesn't that mean ride for you, lie for you?

A. Ride for you, L-I for you.

Q. What's the third letter then?

A. I don't know, it's a blank.

Q. It's what?

A. It's blank. Nothing there.

Q. Didn't you mean when you wrote this letter to Mr. Holloway that you gave to Mr. Martin, that you wanted Mr. Holloway to lie for you?

A. No.

Tr. 69:8-23 (Dec. 1, 2015).

The record during the trial in the instant action also reflects Martin's discomfort with calling Holloway as a witness. On both June 13, 2005, and June 14, 2005, Martin put on the record that Holloway was being called against Martin's advice. Tr. 6800:1—6801:2 (Jun. 13, 2005); Tr. 6932:2-7 (Jun. 14, 2005). On June 14, 2005, Martin also indicated to the Court that he had not spoken with Holloway so he was unsure what he would say if he testified. Tr. 6932:12-15 (Jun. 14, 2005). The Court then indicated that Burwell should be able to advise Martin as to what he hoped Holloway would say if he testified. *Id.* at 6932:16-19. At that time, Martin indicated: "There's more to this that I don't want to put on the record." *Id.* at 6933:2-3. In Martin's typed notes saved in the "2255" electronic folder, Martin included in an entry dated Monday, June 13, 2005, "Put on the record my counsel against calling RH since he is a reluctant witness and I am not certain about the veracity of his testimony." Def.'s Ex. 2 at 2. Below that notation is another

that indicated: "2255 – Put on the record the fact that BB insists on calling witnesses that I don't think is in his best interest."  *Id.*

Martin was asked about his exchange with the Court regarding his advice to Burwell about calling Holloway as a witness.  Martin indicated that at the time of trial, he framed the issue to the Court as a disagreement between Martin and Burwell over whether Holloway should be called.  Tr. 117:9-15 (Dec. 1, 2015).  However, Martin did not think that Holloway would give truthful testimony, *id.* at 119:8-9, 166:25—167:1, nor was he sure whether Holloway would testify as Burwell indicated that he would testify, *id.* at 119:10-12. As such, Martin noted that he was never comfortable with calling Holloway.  *Id.* at 148:2-23, 157:13-22, 158:7-9. In light of the record before the Court, it appears that Martin had reasonable concerns about calling Holloway to testify and Martin handled those concerns in an appropriate manner while continuing his representation of Burwell.

While it is clear that Martin had concerns about the veracity of Holloway's testimony, Burwell and Holloway both maintained that Burwell never coached Holloway nor did Burwell ask Holloway to lie.  While Burwell acknowledged that Holloway visited him at the D.C. Jail during the trial, on or around June 7, 2005, Burwell indicated they did not talk about either the flak jacket or Holloway's testimony generally.  *Id.* at 72:13-25.  Moreover, Burwell testified that he never told Holloway to lie nor did he have other people ask Holloway to lie for him.  *Id.* at 73:1-4.

> 2. *Documents reflect that Ramirez was identified as a potential alibi witness for a different date and Martin pursued that information*

In contrast to Martin's alleged failure to pursue and present Holloway's alibi testimony, documents created by Burwell and Martin prior to and during trial reflect that Ramirez was

identified as a potential alibi witness for a different date and Martin pursued that information. Martin indicated that he spoke with Burwell about alibi witnesses generally but is not sure at what point prior to trial they had this discussion. *Id.* at 105:11—106:4, 132:21—133:10. Specifically, Martin noted that in this particular case there was room for an alibi defense because there was video evidence of the bank robberies, but it was not easy to tell if Burwell appeared in those videos. *Id.* at 104:7-14. Similarly, Burwell himself noted that he was aware from the beginning of the case of the importance of having alibi witnesses, noting that it was "the best thing" he could have in terms of his defense. *Id.* at 34:21—35:1, 35:24—36:3, 48:15—49:20. Nonetheless, Martin testified that in preparing Burwell's defense, he provided Burwell with the dates of the incidents in the indictment, *id.* at 103:23—104:1, and when the topic of alibi witnesses came up, Burwell identified only one alibi witness, Ramirez, *id.* at 104:13-16.

Martin testified that if he knew Holloway could have provided alibi testimony, he would have either listed Holloway as such in the "Defendant's Notice of Alibi Defense" filed with the Court on April 15, 2005, or in the "Ex Parte Motion for Subpoenas Under Seal," filed with the Court on June 2, 2005, because one "can't litigate by ambush." *Id.* at 109:16-23, 111:19-25; s*ee also* Govt.'s Exs. I & J. Martin also indicated that if he was aware of Holloway's potential alibi testimony, he would have had Jones discuss it with Holloway. Tr. 109:22-23 (Dec. 1, 2015).

Martin's account of what he would have done if Burwell identified Holloway as an alibi witnesses is bolstered by his treatment of Ramirez who it is undisputed was, in fact, identified as a potential alibi witness by Burwell. Indeed, the Government introduced into evidence a handwritten note from Burwell to Martin, listing Ramirez's place of work. Govt.'s Ex. B; *see also* Tr. 108:10-13 (Dec. 1, 2015). On this note, Martin wrote an address for Ramirez and a notation

"Gay Pride Parade Day 10:00 AM met @ 4:00 p.m.," presumably in reference to Ramirez's potential alibi testimony.  Govt.'s Ex. B; *see also* Tr. 108:13-17, 60:7-18 (Dec. 1, 2015).  Moreover, both the "Defendant's Notice of Alibi Defense" and the "Ex Parte Motion for Subpoenas Under Seal" filed by Martin on Burwell's behalf identify Ramirez as an alibi witness for Burwell.  Govt.'s Ex. I & J; Tr. 109:6-13, 111:12-14 (Dec. 1, 2015).

The documents created by Burwell and Martin prior to and during trial reveal two important points.  First, while the documents do reflect that Holloway could testify regarding the presence of Burwell's DNA on the flak jacket, there is no mention whatsoever in any of the documents of Holloway's ability to testify as to Burwell's whereabouts on May 27, 2004.  Second, the documents demonstrate that Martin properly proceeded to present Ramirez's alibi testimony when she was identified by Burwell.  As such, the documents support Martin's contention that he was not informed of Holloway's potential alibi testimony and, if he had been, that he would have proceeded in the same way he did to present Ramirez as an alibi witness.

### C. Burwell's account of Martin's explanation for not eliciting Holloway's alibi testimony

Burwell testified that he expressed dissatisfaction to Martin after Holloway was excused from the witness stand at trial because Martin failed to elicit Holloway's alibi testimony.  However, Burwell's account of Martin's reaction to this complaint, i.e., never giving a full explanation as to why he did not ask Holloway about Burwell's whereabouts on May 27, 2004, and never offering to recall the witness, seems implausible.

Burwell provided the following testimony at the evidentiary hearing with respect to this issue.  After Holloway testified at trial, Burwell asked Martin why Martin did not ask Holloway

about Burwell's whereabouts on May 27, 2004.  Tr. 36:15—38:13, 73:6—74:5 (Dec. 1, 2015).

Specifically, Burwell talked with Martin about this issue immediately after Holloway's testimony,

but then discussed it more in depth outside of the courtroom.  *Id.* at 75:1-19.  Burwell characterized

Martin's explanation as follows: "The thing what he told me, to my recollection, was he did not

want Mr. Holloway really as a witness, period. He said that I was the one who was adamant about

pushing him as a witness."  *Id.* at 75:1-4.  Martin also told Burwell that he was focused on

presenting testimony from Holloway regarding the DNA on the flak jacket.  *See, e.g., id.* at 38:7-

10 ("I guess he basically was telling me that he wanted to get more of an explanation on the Flak

jacket because it was, I guess, by cash or weapons or something like that.");  *id.* at 76:8-10 ("[H]e

told me basically he just wanted to question him and get the explanation for the DNA.");  *id.* at

76:25—77:4 ("I think the reason why he told me that he did not do it is because he was more

concerned at the time about the DNA on the Flak jacket and being explained of how it got there –

how the DNA got on the Flak jacket and the Flak jacket was close to all those weapons.").  Burwell

explained:

> All I know is he told me that he was focused on the DNA on the Flak jacket and
> wanted an explanation for it. As far as why he didn't call – excuse me, why he
> didn't ask him the questions about that, he really didn't go into too much detail
> about it, he just basically – we were in the back, you know, we were in the back
> where they hold us in District Court. So we came back there. My other co-
> defendants' counsel was back there, you know, speaking with them. And he was
> just like, you know, at the time he didn't feel as though it was, I don't want to say
> appropriate, but he just said he felt that – he wanted to question about the DNA.

*Id.* at 78:4-15.  As such, according to Burwell, Martin's explanation was that he did not want to

call Holloway at all (a point undisputed by Martin and clear from the record), and that the only

thing that Martin wanted Holloway to explain was the presence of Burwell's DNA on the flak

jacket.

Despite only questioning Holloway about the flak jacket, it is Burwell's contention that Martin knew that Holloway would truthfully testify that Burwell and Holloway were together on May 27, 2004, but Martin did not ask him. *Id.* at 73:25—74:5. By Burwell's account, Martin never really gave an explanation beyond that described above as to why he did not ask Holloway about Burwell's whereabouts during the first bank robbery. However, Burwell contends that Martin told him after the trial concluded that he "messed up" with respect to this issue. *Id.* at 73:17-18. Moreover, the record reflects that Martin never asked to recall Holloway as a witness and Burwell indicated that he did not ask Martin to do so because he did not know that he could make such a request. *Id.* at 38:11-13.

Martin gave a conflicting account of the events at issue during the evidentiary hearing. Specifically, Martin, who maintained that he had not been told by Burwell about Holloway's potential alibi testimony, testified that he did not remember Burwell asking him why he did not elicit alibi testimony from Holloway after he left the stand. *Id.* at 118:15-19, 158:15-17. Martin further indicated that he was surprised when he saw Burwell's affidavit related to the instant motion in which Burwell stated that he asked Martin about this point. *Id.* at 118:18-19. With respect to his questioning of Holloway, Martin testified: "If there were questions to be asked of Mr. Holloway that I failed to ask, I'm not shy; I would have asked the Court to recall the witnesses. I hadn't started practicing a week before and I have recalled witnesses with the permission of the Court . . . ." *Id.* at 119:23—120:2. Martin also denied telling Burwell that he had "messed up." *Id.* at 120:3-5, 153:24—154:5.

Given that there is conflicting testimony regarding the communication between Martin and

26

Burwell after Holloway testified, the Court must determine which account to credit. To credit Burwell's account of the events after Holloway testified, the Court would have to accept that despite calling Holloway as a witness, Martin blatantly ignored Burwell's request to ask Holloway about Burwell's whereabouts on May 27, 2004. After this error was pointed out to him, Martin failed to offer to recall the witness or to provide an explanation as to his decision to ask only about the DNA evidence and not about the alibi, even after Holloway gave testimony consistent with Burwell's account regarding the DNA evidence. Moreover, the Court would have to accept that after committing this error and not attempting to rectify it or inform Burwell of the ability to rectify it by recalling the witness, Martin then told Burwell only after the trial that he messed up. This is contrary to all the other evidence in the record demonstrating that Martin was diligent in his representation of Burwell and worked closely with Burwell on developing his trial strategy. Moreover, it is contradicted by Martin's willingness to call Holloway in the first place at Burwell's request over his advice and despite his concerns that Holloway might perjure himself.

Finally, the Court notes that Martin's account is supported by the fact that it otherwise appears that Martin and Burwell worked closely and harmoniously together in preparing his defense. Indeed, Burwell contended that prior to this issue with Holloway's testimony, he and Martin pretty much saw "eye-to-eye" on the issues because Burwell trusted Martin. *Id.* at 36:23-25. Moreover, Martin described Burwell as "actively involved" in his defense, and indicated that they went over various matters such as trial strategy. *Id.* at 102:7-9. Martin's description of Burwell's participation in his defense is supported by Burwell's handwritten notes regarding his defense in Martin's files and Martin's list of questions to ask Burwell in the preparation of his defense.

### D.  Martin's and Jones' dealings with Holloway prior to his testimony

Burwell raised two additional issues with respect to Martin securing Holloway as a witness at trial.  First, Burwell introduced evidence that Jones might have spoken with Holloway while he was represented by counsel.  Second, as discussed *supra*, the record reflects that unbeknownst to Martin, Jones had failed to properly serve Holloway with two subpoenas.  For the reasons described herein, the Court finds that these facts do not demonstrate that Martin rendered ineffective assistance to Burwell.

Turning first to the counsel issue, Holloway testified that he told Jones at some point that he was represented by counsel, *id.* at 9:12-14, but he was unsure if Jones inquired about this before they spoke during their first meeting, *id.* at 9:15-17.  Martin's notes confirm the fact that Holloway was represented by counsel and that Holloway's counsel indicated that Holloway would not testify.  Indeed, in the typed notes saved in a document in Martin's "2255" electronic file, there is a notation dated May 6, 2005, that reads: "Discussion with REON HOLLOWAY's atty who has advised RH not to testify."  Def.'s Ex. 2 at 1.  The next entry dated May 10, 2005, indicates:

> Discussion with DAVEY JONES who says that REON HOLLOWAY denies knowing anything about a flak jacket or body armor.
>
> Advised BB that we will subpoena REON but probably not call him to testify, since we don't know what he will say.  Moreover, I am now concerned that BB is interested in presenting perjured testimony.

*Id.*  A third entry dated May 11, 2005, reads:

> Discussion with BB regarding the testimony of RH. I told him that I didn't understand why RH would be unwilling to testify about the bullet proof vest if the story is in fact true.
>
> BB says that RH drinks a lot and may not remember details very well. He also says that his atty has probably scared him by advising of potential hostility from the

28

OUSA. This is a plausible explanation, but I have no way of exploring this b/c I cannot talk to or send DJ to talk to RH w/o his atty's consent.

After explaining why I am hobbled, BB said that he would contact RH himself. I cannot stop him from doing that, but I won't assist him in that regard.

*Id.* At the evidentiary hearing, Martin testified that he assumed that Jones would have asked Holloway if he was represented by counsel prior to speaking with him because Jones is a "seasoned investigator." Tr. 128:9-21 (Dec. 1, 2015). However, Martin conceded that it was inconsistent that the notes reflect that Martin was advised on May 6, 2005, by Holloway's attorney that Holloway would not testify, and that on May 10, 2005, Jones had spoken with Holloway. *Id.* at 129:24—130:3. Regardless of this discrepancy, Holloway took the stand after Martin and Holloway's attorney spoke to each other and Holloway during a recess on June 15, 2005. Tr. 7270:6—7272:19 (Jun. 15, 2005). After returning from that recess, Martin indicated that there was no Fifth Amendment issue with regard to the testimony of Holloway. *Id.* at 7273:10-14. As such, the Court concludes that even if the Jones improperly spoke with Holloway while he was represented by counsel, Burwell was not prejudiced by this in any way. Indeed, after a discussion between Martin and Holloway's counsel, Holloway testified on Burwell's behalf.

Turning to the subpoena issue, Martin testified that he has a practice of calling witnesses to Court a day or two in advance of the actual day that he expects them to testify in order to see if they appear, to talk to them about their testimony, and to tell them what to expect when they testify. Tr. 111:4-11 (Dec. 1, 2015). Martin testified that he filed the "Defendant's Ex Parte Motion for Subpoenas," Govt.'s Ex. J, in order to make sure that Holloway and the other identified witnesses appeared to testify at trial. Tr. 110:22-25 (Dec. 1, 2015).

As discussed in depth *supra*, Martin informed the Court during the trial that Holloway

failed to respond to two subpoenas and, as such, requested that the Court direct the Marshals to bring him to Court. However, upon further inquiry from the Court, it appeared that Jones had not properly served Holloway with either subpoena. At the evidentiary hearing, Martin acknowledged that he did not know that Jones had not served the first subpoena when he talked to Holloway in April or May 2005,[7] or that Jones had not effectively served the second subpoena issued in June 2005.[8] *Id.* at 151:11—152:14. Martin further acknowledged that communication between him and Jones regarding the subpoena issue could have been better, *id.* at 152:23, and that this mistake could have led to the Marshals improperly being sent to pick up Holloway, *id.* at 153:6-23.

Burwell presented this evidence to support his claim that Martin provided ineffective assistance to him and highlighted that the notes in the document that Martin had saved in the "2255" folder end on June 13, 2005, the day before the issue of the non-service of the subpoenas was brought before the Court. Def.'s Ex. 2. However, the issue of the service of the subpoena is tangential to the issue before the Court at this juncture, namely whether Martin knew that Holloway could present alibi testimony for May 27, 2004. While the failure to properly serve Holloway with the subpoenas raises some concerns about the investigator's performance in the instant action, the fact remains that Holloway was brought to Court from CTF and did testify at trial. As such, the

---

[7] While it appears from the record during the trial that Holloway was not properly served, Holloway testified at the evidentiary hearing that he thought Jones gave him a subpoena during their second meeting. Tr. 20:4-5 (Dec. 1, 2015). However, the trial record reflects that Jones indicated that he interviewed Holloway in April or early May but did not serve him with the first subpoena. Tr. 6945:12-15 (Jun. 14, 2005).

[8] During the trial, Jones stated that he tried to serve Holloway at his home address, but was told that Holloway was not home. Tr. 6944:17-20 (Jun. 14, 2005). Jones indicated that the woman who answered the door would not accept the subpoena so Jones left the subpoena in the door. *Id.* 6945:1-6.

failure to serve Holloway with a subpoena did not prejudice Burwell because Holloway did testify.

To the extent that the evidence regarding the timing of Jones' interview with Holloway and Jones' failure to serve Holloway with subpoenas was introduced to demonstrate a breakdown in communication between Martin and Jones, the record does not reflect that even if there had been better communication between Martin and Jones that it would have made a difference with respect to the alibi testimony.  Indeed, both Burwell and Holloway testified that they not only told Jones about the potential alibi testimony *but that they both told Martin directly*.  Accordingly, whether or not they also told Jones and Jones failed to tell Martin is irrelevant to the ineffective assistance of counsel claim. Furthermore, Martin indicated, and the Court credits, that Jones did not tell Martin that Holloway could provide alibi testimony.[9]

Burwell also argues that if Holloway had been properly served, Martin would have had an opportunity to discuss the potential alibi testimony with Holloway prior to him taking the stand. Presumably, this argument is premised on the notion that if Martin had a more in-depth conversation with Holloway, he would have been more comfortable allowing him to present the alibi testimony.  However, if the Court accepts Burwell's and Holloway's account, Martin knew about the alibi testimony and asked Holloway about it directly before Holloway testified so having more time to speak with Holloway would not have made a difference.  If the Court accepts Martin's account, Martin did not know about the potential alibi testimony so more witness preparation would not have made a difference because this was not an issue flagged for Martin to explore with

---

[9] The Court notes that in making this finding it directly rejects Holloway's testimony that implies Martin had knowledge that Holloway and Jones spoke about both the flak jacket and Burwell's whereabouts on May 27, 2004, when Martin and Holloway spoke shortly before he testified.

Holloway.

### E.  Post-conviction pleadings filed on Burwell's behalf and by Burwell

Finally, the Court shall address two ancillary issues raised by the parties at the evidentiary hearing that do not weigh heavily in favor of crediting one witness's testimony over another's testimony.   Specifically, Burwell raised the issue of Martin's apparent understanding of the possibility that Burwell would raise an ineffective assistance of counsel claim based on Martin's performance, and the Government raised the timing of Burwell ultimately identifying Holloway by name as the alibi witnesses referenced in his post-conviction pleadings.   In the interest of completeness, the Court shall address each in turn.

During the evidentiary hearing, Burwell pointed to Martin's electronic folder titled "2255,"[10] that included a document with notes made contemporaneously with the trial and the "Notice of Appeal" filed after Burwell was convicted that listed ineffective assistance of counsel as one ground for appeal.   These documents merely establish that Martin was aware of the possibility that Burwell might raise an ineffective assistance claim.   However, the fact that these documents exist does not demonstrate that Martin's performance was ineffective.   Rather, ineffective assistance of counsel claims are regularly brought against criminal defense attorneys. The fact that the claim is raised on direct appeal or that a criminal defense attorney anticipates that such a claim will be raised against him and keeps certain records in the event that he needs to respond to such a claim does not demonstrate that the attorney was, in fact, ineffective.

The Government pointed to the fact that Burwell did not raise his ineffective assistance of

---

[10] Presumably the title of this folder references 28 U.S.C. § 2255, the section of the code under which the instant motion was brought.

counsel claim until he filed the instant § 2255 motion and did not identify Holloway by name as the alibi witness he referenced until ordered to do so by the Court as reasons why Burwell should not be credited.  The fact that Burwell first raised an ineffective assistance of counsel claim in the instant motion, after the final ruling on his appeal, does not demonstrate that he did not have concerns about Martin's performance.  Moreover, the fact that he first identified Holloway by name as the alibi witnesses referenced in response to a Court Order after the matter was fully briefed does not demonstrate that he fabricated the claim.  Burwell proceeded *pro se* and, accordingly, the Court construes his *pro se* pleadings liberally.  Indeed, in Burwell's "Memorandum of Law In Support of Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 USC § 2255," filed alongside his original § 2255 motion, Burwell alleges Martin's failed to properly investigate and interview an "alibi witness" who was "key to connection of DNA on one of the flash [sic] jackets found at one of the alleged stash houses."  Def.'s Memo. at 18.  As such, the Court concludes that this issue raised by the Government neither supports nor discredits Burwell's account of the events at issue.

### F.   Court's credibility determinations and conclusions

Based on the evidence before it and after observing the demeanor of Holloway, Burwell, and Martin and weighing their credibility, the Court finds that Martin's performance did not fall below an objective standard of reasonableness because Martin was not informed that Holloway could present alibi testimony on Burwell's behalf for the May 27, 2004, bank robbery.  In reaching this determination, the Court specifically credits Martin's testimony that he was never told by Burwell, Holloway, or Jones of this potential testimony prior to or during trial and, instead, that he was only informed by Burwell of Holloway's ability to testify regarding the DNA evidence

33

recovered from the flak jacket.  Moreover, the Court notes that this finding is supported not only by Martin's credible testimony during the evidentiary hearing but by the record before it which includes Martin's thorough notes and letters as well as Burwell's notes and letters *made prior to and during trial*.  Indeed, these documents specifically discuss Holloway as a potential witness to explain the presence of Burwell's DNA on one of the flak jackets in evidence but there is no notation in any of these documents that Holloway also may be able to provide information as to Burwell's whereabouts on May 27, 2004.  Moreover, the Court credits Martin's explanation as to how he would have proceeded had he been provided with this information in light of other actions that Martin took on Burwell's behalf in the instant action.  Specifically, Martin's notes reflect that Burwell identified Brenda Ramirez as a potential alibi for the June 12, 2004, bank robbery, and, in response to that information, Martin followed the proper procedures and Ramirez presented alibi testimony on Burwell's behalf at trial.  Finally, the Court finds it implausible that Burwell objected to Martin's failure to elicit alibi testimony on the same day that Holloway testified and Martin did not offer to recall the witness or offer any real explanation regarding his decision to only ask about the flak jacket and not Burwell's whereabouts on May 27, 2004.

In reaching this holding, the Court credits Martin's account over Burwell's and Holloway's account with respect to whether Martin was informed at any point prior to Burwell filing an affidavit related to the instant § 2255 motion that Burwell and Holloway were together on May 27, 2004.  Indeed, the only evidence in the record rebutting Martin's contention that he was not told of Holloway's potential alibi testimony is Burwell's and Holloway's testimony given at the evidentiary hearing.  Burwell's and Holloway's accounts that they both told Martin that they were together on May 27, 2004, are not supported in any other way by the record and both accounts

include specific details that both Burwell and Holloway contend were never communicated to Martin, including the presence of other people on the day in question and the fact that they took Burwell's father out that day to get him drunk for his birthday.

In order to accept Burwell's and Holloway's accounts over Martin's, the Court would have to accept that Burwell told Martin of Holloway's ability to testify as to both the flak jacket and his whereabouts on May 27, 2004; that Martin never made a notation in otherwise thorough notes about the potential alibi but did make notations regarding the flak jacket on more than one occasion; that Burwell in his notes provided to Martin indicated that Holloway could testify regarding the DNA on the flak jacket but never noted that he could provide an alibi for May 27, 2004; that Martin met with Holloway on the cellblock immediately before he called him to testify and that Martin asked Holloway both about the flak jacket and Burwell's whereabouts on May 27, 2004; that after that conversation, Holloway was left with the impression that Martin would ask him both about the flak jacket and about Burwell's whereabouts on May 27, 2004; that shortly thereafter, Martin called Holloway to the stand and after he testified as Burwell indicated that he would with respect to the flak jacket, Martin decided for some reason not to ask Holloway about Burwell's whereabouts on May 27, 2004; that Martin made the decision to only ask about the flak jacket but never provided Burwell with a real explanation as to why he made that decision when pressed, other than to indicate that he wanted to focus on the presence of the DNA on the flak jacket; that after being pressed by Burwell as to why he failed to ask Holloway about Burwell's whereabouts on May 27, 2004, Martin did not recall the witness or offer to recall the witness; and, in contrast, that Martin did call Brenda Ramirez as an alibi when, as Martin's notes reflect, Burwell identified her as an alibi for a different date, June 12, 2004.

In sum, the Court would have to find that Martin talked to both Burwell and Holloway about Holloway's potential alibi testimony[11] and, despite talking to Holloway about this possible testimony shortly before he testified, decided for some reason not to elicit this testimony or rectify his failure to ask about this when it was brought to his attention by Burwell after the fact.  The Court rejects this account of the incidents in light of the evidence before it and after weighing the witnesses' credibility based on its own observations of the witnesses' demeanor at the evidentiary hearing.  Accordingly, the Court concludes that Burwell's ineffective assistance of counsel claim related to Martin's alleged failure to present alibi testimony for the May 27, 2004, bank robbery from Holloway during trial fails because Martin was never informed of this potential testimony until Burwell's *pro se* filing of the instant § 2255 motion and related pleadings.  As such, the Court finds that Martin's performance with respect to this issue did not fall below an objective standard of reasonableness.

### G.  Burwell's supplemental argument regarding *Johnson v. United States*

After briefing was complete and the evidentiary hearing was held, Burwell sent a *pro se* "Motion to Supplement His Section 2255, In Light of *Johnson v. United States*, 135 S. Ct. 2551 (June 26, 2015)," which the Court granted leave to file.  In the supplement, Burwell asserts that his conviction for using and carrying a firearm during and in relation to a crime of violence on or about June 12, 2004 ("Count XI") should be vacated in light of the Supreme Court of the United

---

[11] The Court can infer from Holloway's testimony that based on his account, Martin also knew that Holloway told Jones about the alibi testimony, which would require the Court to accept that Martin had conversations with three separate people – Burwell, Holloway, and Jones – about Holloway's alibi testimony and he still did not ask Holloway about it on the stand or note it in his records.

States' recent holding in *Johnson v. United States*, 135 S. Ct. 2551 (2015). For the reasons described herein, the Court finds Burwell's argument is without merit.

Burwell was convicted of using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(B)(ii). Pursuant to § 924(c)(3), a crime of violence is defined as an offense that is a felony and: "has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or . . . that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

Here, Burwell argues the crime of violence that supported his conviction under § 924(c) was the armed robbery of the Industrial Bank on or about June 12, 2004 ("Count X"). Burwell further argues that armed bank robbery of which he was convicted pursuant to 18 U.S.C. § 2113(a) and (d), is not a crime of violence. While Burwell cites to *Johnson v. United States*, 135 S. Ct. 2551 (2015), in support of his argument, that case is not applicable to the facts of the instant case. Rather, *Johnson* addresses the unconstitutionality of enhanced sentences under the residual clause of the Armed Career Criminal Act, codified at 18 U.S.C. § 924(e). Burwell was convicted pursuant a different section of the same statute, § 924(c), and his conviction did not rest on a finding that he was an armed career criminal based on an analysis under the residual clause. Instead, Burwell was convicted of using and carrying a firearm during a crime of violence, and an armed bank robbery under 18 U.S.C. § 2113(a) and (d), meets the definition of a crime of violence. Indeed, § 2113(d) provides an enhanced sentence for a person who during the commission of a bank robbery "assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device." Here, as the U.S. Court of Appeals for the District of Columbia Circuit noted, Burwell "carried an

AK-47 in both of the robberies in which he participated, though there is no evidence he fired any of the weapons." *United States v. Burwell*, 690 F.3d 500, 502 (D.C. Cir. 2012).  Accordingly, Burwell's carrying of the AK-47 during the bank robbery for which he was convicted satisfies the "crime of violence" requirement under § 924(c).  As such, the Court concludes that there is no reason to set aside Burwell's conviction based on the arguments raised in his supplemental brief.

### H.  Certificate of Appealability

When the district court enters a final order resolving a petition under 28 U.S.C. § 2255 that is adverse to the petitioner, it must either issue or deny a certificate of appealability.  Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 11(a).  By statute, "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Such a showing demands that Burwell demonstrate that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For the reasons set forth above and in the Court's earlier Memorandum Opinions and Orders that have been incorporated herein, the Court concludes that Burwell has failed to make that showing in this case, and, accordingly, no certificate of appealability shall issue from this Court.  To the extent Burwell intends to file an appeal, he must seek a Certificate of Appealability from the United States Court of Appeals for the District of Columbia Circuit in accordance with Federal Rule of Appellate Procedure 22(b).

## IV.  CONCLUSION

For the foregoing reasons, the Court finds no reason to set aside Burwell's conviction or

sentence.  Accordingly, Burwell's [822] Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence is DENIED in its entirety for the reasons set forth in the instant Memorandum Opinion as well as its Memorandum Opinions issued on January 15, 2015, and March 12, 2015, which the Court INCORPORATES herein.  Furthermore, no Certificate of Appealability shall issue from this Court.  To the extent Burwell intends to file an appeal, he must seek a Certificate of Appealability from the United States Court of Appeals for the District of Columbia Circuit in accordance with Federal Rule of Appellate Procedure 22.

An appropriate Order accompanies this Memorandum Opinion.

*This is a final, appealable order.*

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE